## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CASE NO.: 6:22-cv-00068

STEVEL SMITH,                                        **JURY TRIAL DEMANDED**

     *Plaintiff,*

vs.

WALT DISNEY PARKS AND RESORTS
U.S., INC.,

     *Defendant.*

_____/

## **COMPLAINT**

Plaintiff Stevel Smith ("**Plaintiff**" or "**Mr. Smith**"), by his undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendant WALT DISNEY PARKS AND RESORTS U.S., INC., ("**Defendant**" and/or "**Disney**"), and alleges as follows:

## **INTRODUCTION**

1.    This case is about diabetic employee whose supervisors subjected him to months of humiliation and abuse because of his disabilities and then orchestrated a scheme to terminate his employment after he complained.

2.    Plaintiff Stevel Smith brings this action pursuant to the American with Disabilities Act of 1990 ("**ADA**"), as amended 42 U.S.C § 12101 *et. seq.*, and the Americans with Disabilities Act Amendments Act ("ADAAAA") of 20008, to

correct unlawful employment practices on the basis of Plaintiff's disability and to provide him with appropriate relief.

3.      Defendant Disney World violated the ADA/ADAAA by altering the terms and conditions of his employment because of his disability.  Plaintiff's managers refused to accommodate Plaintiff's diabetes needs and said things like, "I don't care about diabetes," or, "if you take your medication, you can go home." The managers subjected Plaintiff to humiliation and physical danger.  For instance, Mr. Smith repeatedly urinated his pants because of Disney's failure to accommodate his diabetes needs.  On another occasion, Plaintiff's manager refused to relieve Mr. Smith from work after he said he felt as if going to faint. "You don't look sick," the manager said, "so you're not going home."

4.      After Plaintiff complained of the above-described discrimination, his managers orchestrated a scheme to terminate his employment under the guise of a lawful termination.   Ultimately, Defendant Disney terminated Plaintiff's employment because of his disability and because he complained of disability discrimination, while retaining a similarly situated employee who was not diabetic and who did not complain of disability discrimination.

5.      Defendant Disney has damaged Plaintiff and he is entitled to relief.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this action under 28 U.S.C. § § 1331 (federal question).

7.     Venue is proper in the Middle District of Florida under 42 U.S.C. § 20003-5(f)(3) and 28 U.S.C. § 1391(b) because a substantial portion of the acts or omissions giving rise to this action occurred in the Middle District of Florida and because Defendant Walt Disney World maintains its principal place of business within the Middle District of Florida.

## PARTIES

8.     Plaintiff Stevel Smith is an individual man residing in Osceola County, Florida.

9.     Plaintiff is expressly authorized to bring this action by 42 U.S.C. § 12117(a).

10.    Walt Disney Parks and Resorts US, Inc., is a Florida profit corporation.

11.    Defendant is a "covered employer under 42 U.S.C § 12111(5)(A) because Disney World employs 15 or more employees on its payroll for 20 or more calendar workweeks in either the current or preceding calendar year.

## ADMINISTRATIVE PREREQUISITES

12.    Plaintiff has complied with all administrative requirements.

13.    On or about December 21, 2020 Plaintiff timely filed a charge of discrimination (Charge No. 510-2021-01361) with the U.S. Equal Employment

Opportunity Commission ("**EEOC**") naming Walt Disney World as the Respondent.  Plaintiff alleged he was discriminated based on his race, national origin, disability and retaliated against based on those protected classes.  On or about October 21, 2021, Plaintiff filed an amended charge of discrimination, checking the box for discrimination based on "other," and including Hostile Work Environment and Retaliatory Hostile Work Environment, in addition to the above-described discriminatory bases.

14.     On or about November 17, 2021, the EEOC issued a right to sue notice.

15.     On or about January 11, 2022, Plaintiff timely commenced this action within 90 days of receiving his notice of suit rights from the EEOC.

## FACTUAL ALLEGATIONS

16.     Stevel Smith is a 52-year-old black man of Jamaican national origin.

17.     Mr. Smith is the father of five children.

18.     Mr. Smith is a type two diabetic and takes insulin daily.

19.     Mr. Smith experiences extreme and frequent urges to urinate because of his diabetes.  Mr. Smith also takes medication for high blood pressure and cholesterol.

20.     Disney World hired Mr. Smith as a "Resort Houseperson" at the Disney Yacht and Beach Club on or about September 10, 2017.   Mr. Smith had been working for Disney since 2013 at another part of the resort.

21.     Mr. Smith, an immigrant who understood the value of hard work, worked with excellence and pride, and greeted every guest he encountered with his infectious smile, fully committed to Disney's purported mission of "creating happiness" for its guests.

22.     Mr. Smith provided meticulous service at the Disney Yacht and Beach Club.  Mr. Smith kept the stock rooms in immaculate condition, never leaving a shift before ensuring the towels were tidy, the supplies were full, and no item was left out of place.

23.     Further, Mr. Smith assisted the housemaids by stripping the bedrooms and clearing out rooms, cleaning hallways, and taking out the trash. Mr. Smith was so passionate about his work that he even offered to help clear additional rooms for housekeepers beyond those assigned to him.

24.     Meanwhile, Walt Disney World subjected Mr. Smith to relentless retaliation and the most hostile work environment he has ever experienced.

25.     Beginning in or around January of 2018, a manager reprimanded Ms. Smith for complaining about non-black/Jamaican coworkers who disrespected Mr. Smith, because of his race and national origin, by failing to keep the stock room tidy as required by Defendant's policy, and ultimately, that Mr. Smith had to do the work.

26.     On or about May 7, 2018, Mr. Smith's manager, Christian (last name unknown), approached Mr. Smith on the fifth floor of the Disney Yacht & Beach Club.  Christian told  Mr. Smith that Kim Marinaccio ("**Marinaccio**"), Defendant's "General Manager" was coming and Mr. Smith had to hide because he did not "look presentable."  Christian said, "If you don't disappear, you'll see what I'll do." Christian told Mr. Smith to hide in the linen closest.  Christian said, "Don't get out until she leaves."  As Mr. Smith was preparing to go in the closest, Christian said, "She's coming—disappear!"

27.     Mr. Smith remained inside for fifteen minutes, feeling the lowest he has ever felt.  He wept behind the closet door.  He looked at his outfit to see whether he was "presentable," which he was.  Indeed, his shirt was clean and pressed, and he looked no different than any other day.  He could not understand why he was treated differently because of his race.

28.     Soon thereafter, Mr. Smith complained  to a manager about the treatment.  Mr. Smith cried as he explained the humiliation Christian put him under.

**Disney Insists on Humiliating and Abusing Plaintiff because of his Disability**

29.     Meanwhile, Defendant and its agents—including Plaintiff's immediate supervisors—subjected Plaintiff to relentless humiliation, abuse, and hostility because of his disability.

30.     Defendant and its supervisors were aware that Mr. Smith was a diabetic.

31.     For example, on or about January 10, 2018, Mr. Smith was working in the hotel lobby area when his sudden and extreme need to urinate arose.  Mr. Smith desperately rushed to the nearest restroom.

32.     Kelsey (last name unknown), Plaintiff's Manager, saw Mr. Smith enter the restroom, and waited outside the door while he went in.  Kelsey reprimanded Mr. Smith the moment he exited.

33.     Kelsey said, "Don't use that restroom!"

34.      "But I am a diabetic," Mr. Smith said.  "Sometimes I have to go as soon as I feel the urge—I can't help it."

35.     Kelsey said, "I don't care about diabetes."

36.     Kelsey escorted Mr. Smith to the office and reprimanded him. She explained that he had to use the cast restroom.  However, the cast restroom was on the other side of the resort.

37.     Mr. Smith asked Kelsey what he should do if he urinated his pants. She told him that he would have to go to costuming and ask for another costume.

38.     Later that week, Mr. Smith again had the sudden urge to urinate while he was working near the hotel lobby.  He hurried to the cast restroom to no avail.  Mr. Smith urinated his pants on the way.

39.     He was humiliated—his pants soaking wet, embarrassed as families passed by.

40.     Mr. Smith went into a corner and cried.  Then he had to collect himself so he could go to the costume department and explain that he needed to replace his clothing because of what happened to him.

41.     In or around October of 2019, Plaintiff said, "Christian, I'm not feeling so well, I'm about to pass out."  Christian said, "Are you asking to go home?"  Mr. Smith said, "Well, my blood sugar is very high, and I feel like I'm going to faint."  Christian said, "You don't look sick to me, so I'm not sending you home … I'll give you some water."  Mr. Smith was extremely unwell.  He said, "I need to go home."  Again, Christian was defiant.  "Just sit for thirty minutes.  You're not going home because you don't look sick."

42.     Defendant further discriminated against Mr. Smith by failing to accommodate his disability.  Indeed, on or about October 30, 2019, Anthony (last name unknown), the "Housekeeping Manager" refused to allow Plaintiff to take his diabetes medication.  Anthony said, "You have to keep it in the locker room."  Mr. Smith said, "But this is my doctor's prescribed medication."  Anthony was defiant.  He said, "You may not bring with you." If you bring it with you, then you can go home."

43.     Mr. Smith begged Anthony to let him take his medicine—not only for his diabetes, high blood pressure, and high cholesterol, but so he could be a responsible employee and carry out his tasks.

44.     Anthony insisted on refusing to allow Plaintiff to take his medication.

45.     Consequently, Mr. Smith's blood sugar rose so high that he urinated his pants.  Mr. Smith was humiliated once again.

46.     Further, Anthony physically relocated Mr. Smith's medication to a locker beyond Mr. Smith's reach.

47.     Mr. Smith complained to employee relations on or about November 18, 2019.  He said, "Anthony is not allowing me to take my medication to my station."  Plaintiff also complained about how Wyatt and Christian also humiliated him because of his disability. An H.R. person said, "OK, we'll investigate."

48.     When nothing happened, however, Plaintiff contacted Ozzy and asked whether they were going to conduct an investigation.  Ozzy said, "If you get a lock for the linen closest, I'll give a locker for you to keep your medication there."

49.     Shortly thereafter, on or about November 4, 2019, Amy began assigning Plaintiff the work of other cast members, making his job impossible to complete. Consequently, Plaintiff injured his back while inspecting a room

9

because of the additional work and his inability to take medication. The situation was apparent to Plaintiff: he was being worked harder because of his disability.

50.     On or about November 5, 2019, Plaintiff requested a meeting with Encinosa, De La Garza the "Executive Housekeeper Manager," and a union shop steward, Sylvester (last name unknown).  Mr. Smith complained about Anthony, and how he denied Mr. Smith his ability to take his medication on October 30, 2019.  Mr. Smith asked what the Company was going to do to make sure that never happened again.

51.     Plaintiff's managers ignored Mr. Smith and instead used the opportunity to humiliate him further.  For instance, Encinosa said, "You're the only one not doing the job, what is it?"  Similarly, Wyatt said, "You Jamaican guy, why you not finishing you're job?  Is it because of your age, that you can't finish on time, and you're sitting on the clock to get overtime?"

52.     Mr. Smith said, "I'm here to do the job to the best of my ability, and make sure the guests are happy and taken care of."

53.     Wyatt said, "How is Angela? (Plaintiff's wife).  I saw her this morning. When you're at home, how does she deal with you?  At work you complain about everything."

54.    On or about November 7, 2019, Plaintiff suffered a back injury from the increased workload.  Plaintiff hurt his back while he was pulling the super supply.

55.    On or about November 11, 2019, Plaintiff's manager assigned Plaintiff to inspect room 3019.  Upon arrival of the room, Plaintiff knocked several times. He asked the room's occupant if he had permission to enter. After getting permission, he entered the room only to find a nude man in the shower.  Mr. Smith told the guest he will come back later.

56.    Plaintiff left immediately after being in this uncomfortable situation, and conveyed this experience to Syvana, his manager.  Mr. Smith explained that he was nervous to go by himself.

57.    Syvana told him that he had no choice but to complete this task himself. Plaintiff asked if a coworker could accompany him but Syvana denied his request.

58.    On or about November 18, 2019, Plaintiff complained to employee relations about Anthony refusing to allow Mr. Smith to take his medication.

59.    Plaintiff arranged a virtual meeting with a representative from guest relations, a union representative, and Marinaccio.

60.     The representative from guest relations said, "You were not doing your job—you were doing nothing at work."   Mr. Smith and the union

representative pleaded with Marinaccio explaining that he was being retaliated against, and that he was a good worker who deserved his job back.  Marinaccio said, "OK, we'll get back to you as soon as we can."

61.   On or about December 2, 2019, was cleaning the linen room at around 4:30 P.M. when Wyatt and Marian walked in and asked Mr. Smith what his remaining tasks were.  Mr. Smith explained that he first had to clean the linen room and then go to the room inspection.  Wyatt said, "Stop cleaning, go to the room inspection, and then go home."  Plaintiff followed Wyatt's orders.

62.   On or about December 3, 2019, at 10:20 AM, Anthony and asked him why the linen room was not cleaned.  Plaintiff said, "I was going to do it, but Wyatt told me not to.  He told me, 'Stop cleaning … and then go home.'"

63.   Anthony responded to Mr. Smith with an aggressive, unwelcoming tone, saying, "You are the only houseperson who complains and is not doing [his] job, whenever the managers tell you to do something, shut up and do not say anything." Mr. Smith was left speechless.   Anthony said, "you are the only houseperson complaining."

64.   Mr. Smith knew that his managers were bullying him, and they wanted so desperately to terminate him.

65.   At around 2:30 P.M., Plaintiff had a meeting with Syvana, Anthony, Amy, and Wyatt.  They asked Plaintiff to write a statement saying that he failed to

clean the linen room on December 2, 2019 … when Wyatt instructed him not to "stop cleaning … and then go home."

66. On or about December 17, 2019, Mr. Smith arranged a meeting to complain to Marinaccio regarding the hostility from his managers throughout 2019, including the refusal to allow Mr. Smith to take his medication and how Mr. Smith was being treated unfairly.

67. Marinaccio told Mr. Smith she was very impressed with his work performance.

68. She said, "If Christian was here I would have to fire him because Christian cannot look at me and tell me there was no question that what he did was wrong." Marianaccio said, "I'll ensure that these things are taken care of."

69. However, Defendant never "took care of" anything. Indeed, Defendant never even conducted an investigation to Plaintiff's discrimination complaints.

70. Instead, Disney terminated his employment.

## Defendant Orchestrates a Scheme to Terminate Plaintiff Under the Guise of a Lawful Termination

71. After the December holidays, Defendant and its agents continued their retaliatory campaign of discriminating against Plaintiff.

72. On or about February 5, 2020, De La Garza told Mr. Smith, "Your duty is not to strip rooms, if I catch you stripping the room I will fire you."

73.     On or about February 7, 2020, Miriam (last name unknown) the "Floor Manager," asked Plaintiff to strip a room for her.  Mr. Smith told her that De La Garza instructed him not to strip the rooms."   However, Miriam said, "I'm the manager, you have to do whatever I tell you."   Mr. Smith—whose immediate supervisor had just threatened his employment should he strip a room—told Miriam that he was busy and that he would help her only if he had completed his tasks assigned by De La Garza first.

74.     A housekeeper, "Maria" (last name unknown) complained to Ryan Schroeder ("**Schroeder**"), Defendant's "Housekeeping Guest Experience Manager," who then summoned Mr. Smith to his office and asked him to assist Maria.

75.     Mr. Smith said, "I told her that I had my own job duties to do, but that I would help her if I got the chance."  Mr. Smith said, "Also, [De La Garza] told me not to strip the room because that's not my job."

76.     Schroeder was furious.  He said, "OK, you know what?  Go to lunch now!"

77.     Earlier that day, Anthony approached Mr. Smith and said, "You're always smiling, I want to be happy like you."

78.     On or about February 13, 2020, Plaintiff overheard Anthony and Schroeder discussing a scheme to orchestrate Mr. Smith's termination.  Mr. Smith

went to their office around 11:45 A.M. to request linens for a housekeeper. However, Mr. Smith stopped himself before knocking when he heard Anthony telling Schroeder, "You asked Stevel to strip the room for Maria and he refused, but you can't suspend him for not stripping the room but his job duties do not include stripping rooms." Anthony said, "But I'm gonna look for something that will go against him, and I'm going down to the main office to ask Christina or McKenzie to pull the key log for Stevel and if I find anything I will call you and send [Plaintiff] to the office." Schroeder agreed with the scheme. He said, "That will work."

79.     At around 3 P.M., Anthony suspended Mr. Smith's employment. Schroeder had called Mr. Smith and told him to report to Anthony's office. When he arrived a shop steward was present. Before entering, Mr. Smith asked the shop steward, "What's going on, why am I here?" The shop steward said he had no clue. The two entered Anthony's office.

80.     Anthony said, "Do you know why you're here?" Mr. Smith said he did not.

81.     Anthony said, "Yesterday you did not complete room inspection, but you marked it as complete. We have to suspend you." Mr. Smith had no idea what Anthony was referring to. Mr. Smith said, "What are you talking about?"

82.     Anthony said, "Write a statement saying that you lied about the room, saying that you inspected it when you never did."  Anthony said, "We have to suspend you until further notice.  Give me your keys."

83.     On or about March 8, 2020, the Company terminated Plaintiff's employment.

84.     De Le Garza said, "The Company doesn't need you anymore because you're a liability.  We have to let you go."

85.     Mr. Smith was shocked.  He requested a writing indicating that he was terminated.

86.     De La Garza said, "No writing—just words.  It was nice working with you.  I hope things work out for you."

87.     The union told Plaintiff the Company should have given him a written reprimand before terminating his employment.  Indeed, per Company policy, Defendant extends suspended workers an opportunity to return after issuing a warning or talking to them, but Defendant never gave Mr. Smith a chance to reclaim or earn his position.

### Defendant Terminated Plaintiff because of His Disability and because He Complained about Disability Discrimination

88.     Defendant treated Plaintiff differently than similarly situated, non-diabetic cast members who did not complain about discrimination.

89.     For instance, Disney had also suspended Edner—another houseperson—for the same alleged failure to inspect a room as it accused Plaintiff of.  However, Disney reinstated Edner's employment in June of 2020.  Disney never reinstated Plaintiff's employment.

90.     Disney terminated Plaintiff's employment because he is a diabetic and because he complained about disability discrimination.

91.     Conversely, Disney did not terminate Edner's employment, a non-diabetic employee who did not complain about disability discrimination.

92.     Anthony and De La Garza's decision to terminate Plaintiff's employment does not comport with Marinaccio who told Plaintiff that she was extremely impressed with Mr. Smith's work—and that he would not be suspended … but Christian would be fired and Anthony would likewise be disciplined.

93.     Defendant never even explained to Plaintiff why he was terminated following his suspension. Plaintiff's suspension was the result of a falsified, incomplete room inspection report, yet his termination was never explained.

94.     The above are just some of the examples of unlawful discrimination and retaliation Defendant subjected Claimant to on a continuous and on-going basis throughout his employment.

95.     Defendant exhibited a continuous practice of discrimination, and Mr. Smith therefore makes all claims herein under the continuing violations doctrine.

96.     For example, Kelsey's hostility towards Plaintiff's diabetes was the same hostility evinced by Anthony who also "did not care" about diabetes, and failed to accommodate Plaintiff's need to take medication to work.

97.     Defendant violated the ADA/ADAA by discriminating against Plaintiff because of his disability and retaliated against him for requesting an accommodation to take his diabetes medication, and for complaining about disability discrimination.

98.     Defendant unlawfully discriminated and terminated Plaintiff's employment because of his disability and because he complained and opposed disability discrimination.

99.     As a result of Defendant's unlawful conduct, in violation of the ADA/ADAA, Plaintiff has suffered damages.

100.    Plaintiff has suffered emotional distress, mental anguish, loss of personal dignity, and other intangible damages.

101.    Indeed, Mr. Smith cries every time he drives near Defendant's property.  Mr. Smith cries every time he passes Disney, doing his part time work as a rideshare driver.  Mr. Smith reflected on how much he loved his job, how he performed with excellence, and lamented the fact that he was terminated because he stood up for what was right—that Disney was treating him differently because he was a diabetic.

102.    Plaintiff also seeks punitive damages against Defendant as Disney willfully violated Plaintiff's rights by depriving Plaintiff of his civil right to pursue an equal employment opportunity in an environment free of race discrimination, disability discrimination, retaliation.

103.    At bottom, Defendant is liable for depriving Plaintiff of his personal dignity and his civil right to pursue an equal employment opportunity in a work environment free from unrelenting discrimination, harassment, and retaliation, and wrongful termination.

## CAUSES OF ACTION

### COUNT I
**ADA, 42 U.S.C § 12101**
**Hostile Work Environment – Disability**

104.    Plaintiff reincorporates the allegations in paragraphs 29-70.

105.    Defendant violated the ADA by altering the terms and conditions of Plaintiff's employment because he complained of disability discrimination.

106.    Plaintiff engaged in protected activity under the ADA by requesting to take his diabetes medication at work, by requesting to use a restroom close to his worksite—so as to prevent urinating his pants—and by complaining about managers, supervisors, and executives who discriminated against him because of his diabetes.

107.   The Company subjected Plaintiff to unwelcome harassment after and because he engaged in the above-described protected activity.

108.   Plaintiff's manager, Kelsey, told him that she "did not care about diabetes," when he said that he had the frequent urge to urinate, and that he could not use the guest restroom under any circumstance.  When Plaintiff asked what he was to do if he urinated his pants, Kelsey told Plaintiff that he would have to go to the costume department and explain that he needed a new uniform because he urinated in his pants.

109.   In or around early October of 2019, Plaintiff told his manager he was not feeling well, his blood sugar was very high, and that he was going to pass out. Christian said, "You don't look sick to me, I'm not sending you home … have some water."  Plaintiff said he was extremely sick and needed to go home."  Christian told Plaintiff to "just sit for thirty minutes.  You're not going home because you don't look sick."

110.   On or about October 30, 2019, Plaintiff asked his supervisor, Anthony if he could keep his diabetes medication close by in the linen closest.  Anthony refused.  Plaintiff said he needed to take it because it was prescribed medication for his diabetes.  De La Garza told Plaintiff, "You may not keep your medication there … if you do, you can go home."  Consequently, Plaintiff urinated his pants,

and was humiliated.  Moreover, this physically threatening conduct increased Plaintiff's blood pressure, his cholesterol, and affected his ability to work.

111.   On or about November 4, 2020, Amy began assigning Plaintiff the work of other cast members, making his job impossible to complete. Consequently, on or about November 7, 2020, Plaintiff injured his back pulling super supply with his hands because of the additional work and his inability to take medication. The situation was apparent to Plaintiff: he was being worked harder because of his disability.

112.   Plaintiff's protected activity was the but for cause of the above-described harassment because such harassment would never had occurred had Plaintiff not complained about disability discrimination or requested an accommodation under the ADA.

113.   Moreover, the harassment was sufficiently severe and/or pervasive to alter the terms and conditions of Plaintiff's employment.  As an initial matter, Plaintiff perceived the harassment as severe and pervasive because he complained about disability discrimination on multiple occasions.  To be sure, any reasonable person in Plaintiff's position would likewise adjudge the above-described harassment as severe and/or pervasive because such conduct was frequent, severe, physically threatening and humiliating, and because the harassment

described throughout this complaint unreasonably interfered with Plaintiff's job performance.

114.   Defendant's supervisors, managers, and executives insisted on humiliating Plaintiff on multiple occasions because of his diabetes.   The harassment was physically threatening and humiliating.   Indeed, Plaintiff's supervisors threatened to "go home," if he took his diabetes medication at work. Further, managers repeatedly humiliated Plaintiff by engaging in conduct that resulted in Plaintiff urinating his pants on multiple occasions.   Plaintiff had no choice but to go to the costume department to request to new uniforms because he had spoiled his prior uniform as a result of his manager's insistence on refusing to allow Plaintiff to use the restroom when his diabetes caused his urge to urinate.

115.   Disney World is vicariously or directly liable for the above-described environment because Disney World had actual knowledge of the discrimination and because Disney World's managers, supervisors and executives directly participated and facilitated the discrimination.

116.   These allegations provide sufficient factual detail to suggest intentional discrimination in the form of a hostile work environment because of Plaintiff's disability.

117.   Likewise, these allegations are continuous in nature and Plaintiff brings these claims under the continuing violations doctrine.

118.   Plaintiff has been damaged as a result of Defendant's unlawful employment practices in violation of the ADA.

119.   As the above-described harassment was knowing and willful, Plaintiff seeks punitive damages against Disney World.

## COUNT II
### ADA, 42 U.S.C. § 12203(a)
### Retaliation

120.   Plaintiff reincorporates the allegations in paragraphs 41-93.

121.   Defendant violated the ADA/ADAA by intentionally discriminating against him after and because he complained about disability discrimination.

122.   Plaintiff engaged in protected activity by complaining directly to various supervisors, managers and executives.  On or about October 30, 2019, Plaintiff engaged in protected activity by complaining to his manager Anthony after Anthony refused to allow Plaintiff to take his diabetes medication (Plaintiff saying, "But this is my doctor's prescribed medication.").  On or about November 5, 2019, Plaintiff complained to De La Garza and union shop steward, Slyvester about Anthony's refusal to let him take medication.  Plaintiff engaged in further protected activity on or about November 18, 2019 when he complained to employee relations about discrimination perpetrated by his managers, Anthony, Wyatt and Christian.  On or about December 17, 2019, Plaintiff engaged in

protected activity by complaining to Marianaccio about the discrimination perpetrated by Anthony, Wyatt, and Christian.

123.   Plaintiff suffered materially adverse actions because he engaged in the above-described protected activity.  After Plaintiff complained to Anthony that he needed his medication near by, Anthony told Plaintiff "You may not bring it with you … if you do, then you can go home."  Consequently, Plaintiff's blood sugar skyrocketed and he urinated his pants, humiliated once again.  Plaintiff suffered further materially adverse actions when employee relations told Plaintiff they would "investigate," yet no investigation ever ensued, and Plaintiff suffered further harassment and retaliation as a result.  After Plaintiff complained to Wyatt on or about November 18, 2019, Wyatt said, "How does [your wife] deal with you? At work you complain about everything."   After Plaintiff complained to Marinaccio, she told Plaintiff, "If Christian was here I would have to fire him … I'll ensure that these things are taken care of," yet never "[took care of" anything.

124.   Plaintiff suffered further materially adverse actions in or around February of 2020, when Wyatt, Anthony, and De La Garza began scheming to terminate Plaintiff's employment ("You can't suspend him for not stripping the room because it's not his job … I'm gonna look for something."  Plaintiff suffered further materially adverse action on February 13, 2020, when Anthony suspended

Plaintiff, and when De La Garza said, "The Company doesn't need you anymore because you're a liability."

125.   Any reasonable worker might well have been dissuaded from complaining about discrimination if he knew his supervisor would repeatedly tell him he could not take his diabetes medication at work, he could go home if he did, and the employee would urinate his pants as a result; if employee relations told him they would "investigate" his discrimination complaints, yet no investigation occurred, and subsequent discrimination and retaliation ensued as a result; if supervisors would tell the employee he complained too much, and questioned how his wife dealt with all the complaints at home; if the general manager said she would "ensure that these things are taken care of," but never did; and if the supervisors would orchestrate a scheme to terminate the employee under the guise of a lawful termination; and an a reasonable worker well might have been dissuaded from complaining about discrimination if his supervisor terminated his employment and said, "The Company doesn't need you anymore because you're a liability."

126.   Plaintiff Smith's protected activity and the subsequent materially adverse actions are causally connected based on temporal proximity, and because the protected activity and the adverse actions are not wholly unrelated.

127.    Indeed, Anthony's threats to Plaintiff that he could "go home," if he took his disability medication is directly related—and would not have occurred but-for—Plaintiff's request to have his disability medication close to him. Likewise, Plaintiff's complaints to Wyatt regarding discrimination and Wyatt's denial thereof, and asking Plaintiff how his wife "dealt with [him]" at home occurred—seconds later—because Plaintiff complained to Wyatt.  Moreover, Anthony, discussing a scheme to terminated Plaintiff's employment with Del La and Anthony telling Plaintiff, "The Company doesn't need [him] anymore because [he was] a liability," is directly related to Plaintiff's discrimination complaints, and would not have occurred because of those complaints.

128.    The above-described conduct gives rise to the reasonable inference that Defendant Disney subjected Plaintiff to a retaliatory hostile work environment because of his disability in violation of the ADA/ADAA.

129.    Plaintiff has been damaged by Defendant Disney's employment practices in violation of the ADA/ADAA.

<u>COUNT III</u>
**ADA, 42 U.S.C § 12101**
**Disparate Treatment – Disability**

130.    Plaintiff reincorporates the allegations in paragraphs 41-93.

131.    Defendant violated the ADA by intentionally discriminating against Plaintiff because of his disability.

132.   Plaintiff is a diabetic individual.  Because diabetes substantially limits at least one of Plaintiff's major life activities, Plaintiff is an individual with a disability under the ADA.

133.   Plaintiff is a covered individual under 42 U.S.C § 12112(a) because, as described throughout this complaint, Plaintiff can and did perform the essential functions of his employment.

134.   Disney World is a covered employer because Disney World engages in an industry affecting commerce and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

135.   Plaintiff was fully qualified to be a "houseperson" because and could—with or without reasonable accommodations—perform all the essential functions of the position.  Plaintiff never received negative performance reviews, and had worked for the Company without issue for more than five years.

136.   Plaintiff suffered an adverse employment action because of his disability.  On or about March 8, 2020, Disney terminated Plaintiff's employment because of his disability.  De La Garza said, "The Company doesn't need you anymore because you're a liability.  We have to let you go."  Hence, the Company terminated Plaintiff's employment because of his disability.

137.   The Company treated Plaintiff less favorably than similarly situated individuals who did not have a disability.

138.   For example, the Company did not terminate Ednar's employment even though Edner was initially suspended on the same day as Plaintiff for allegedly failing to inspect a room.

139.   However, the Company reinstated Ednar's employment following his suspension, yet terminated Plaintiff's employment after his purported suspension.   Likewise, the Company enforced its policy to extend suspended employees an opportunity to return after issuing a warning, yet never allowed Plaintiff to return after issuing him a warning.   This point is buttressed by the fact that Syvana, the shop steward, told Plaintiff he was entitled to such warning prior to termination.   Yet, the Company treated Plaintiff less favorably than Ednar—a non-diabetic individual—by reinstating Ednar's employment following his suspension, while not reinstating Plaintiff's employment following his suspension.

140.   Thus, Plaintiff and Ednar were involved in or accused of the same or similar conduct, but were disciplined in different ways.   The quantity and/or quality of Ednar's alleged misconduct and Plaintiff's alleged misconduct are nearly identical because both employees were accused of failing to inspect a room. However, the Company enforced its policies less favorably to Plaintiff because of his disability.

141.     These allegations are sufficient to suggest the Company intentionally discriminated against Plaintiff because of his disability and because he requested disability accommodations, and because he complained about disability discrimination.

142.     Plaintiff has been damaged as a result of Defendant's unlawful employment practices in violation of the ADA.

143.     As the above-described harassment was knowing and willful, Plaintiff seeks punitive damages against Disney World.

**COUNT IV**
**ADA, 42 U.S.C. § 12112(b)(5)(A)**
**Failure to Accommodate**

144.     Plaintiff reincorporates the allegations in paragraphs 29-65.

145.     Defendant violated the ADA by discriminating against Plaintiff on the basis of his actual and/or perceived disabilities and/or record of impairment by failing to provide reasonable accommodations for his disabilities.

146.     Disney World had a legal duty, under the ADA, to provide a reasonable accommodation to Plaintiff as a qualified individual with a disability.

147.     Plaintiff is a diabetic individual.  Because diabetes substantially limits at least one of Plaintiff's major life activities, Plaintiff is an individual with a disability under the ADA.

148.    Plaintiff is a covered individual under 42 U.S.C § 12112(a) because, as described throughout this complaint, Plaintiff can and did perform the essential functions of his employment.

149.    Disney World is a covered employer because Disney World engages in an industry affecting commerce and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

150.    Plaintiff was fully qualified to be a "houseperson" because and could—with or without reasonable accommodations—perform all the essential functions of the position.  Plaintiff never received negative performance reviews, and had worked for the Company without issue for more than five years.

151.    Plaintiff demanded a specific request for a reasonable accommodation when he asked to use the restroom closest to his worksite, rather than the cast member restroom.

152.    Plaintiff's specific request to use the restroom closest to his worksite was a reasonable accommodation under the ADA because such accommodation would enable Plaintiff to perform the essential functions of his job.  Plaintiff required an accommodation to use the restroom nearest his worksite—as opposed to the one on the other side of the resort—because Plaintiff urinated his pants without such accommodation.

153.   The above accommodation allowed Plaintiff to perform the essential functions of his job without urinating himself and spoiling his uniform, which Disney required him to keep clean.

154.   Disney failed to accommodate Plaintiff and required him to use the cast member restroom only, which resulted in Plaintiff urinating his pants on multiple occasions.

155.   Plaintiff further demanded a specific request for a reasonable accommodation when he asked Anthony if he could keep his diabetes medication in a discrete location in the linen closet.

156.   Plaintiff's specific request to keep medication by his worksite in the linen closest was a reasonable accommodation under the ADA because such accommodation would enable Plaintiff to perform the essential functions of his job.  Plaintiff required an accommodation to use keep his doctor's prescribed diabetes medication near his worksite because he had to take insulin multiple times per day.  Plaintiff could not survive without his diabetes medication. Indeed, Plaintiff nearly fainted one day when his manager Chrisitan did not allow him to go home because he "did not look sick," and threatened to "send [Plaintiff] home" should he take his diabetes medication at work.

157.   Disney failed to accommodate Plaintiff when Anthony refused to allow Plaintiff to keep his medication in the linen closest.

158.   To be sure, allowing Plaintiff to keep his medication by his worksite, and by likewise allowing him to use a restroom closest to his worksite away from the linen closest did not cause Disney an undue hardship of any kind.

159.   Disney violated the ADA by failing to accommodate Plaintiff's reasonable accommodations.

160.   As a result of Disney's failure to accommodate Plaintiff's specific requests, Plaintiff has suffered damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff demands judgment against Defendant, containing the following relief:

A.      Pursuant to ADA 42 U.S.C. § 12112, an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

B.      Pursuant to ADA 42 U.S.C. § 12112, an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

C.      Pursuant to ADA, 42 U.SC. § 12112, an award of punitive damages for damages arising from Defendant's discriminatory employment practices with malice or with reckless indifference to Plaintiff's rights under federal and state law;

D.      Pursuant to ADA 42 U.S.C. § 12112, an award of costs that Plaintiff has incurred in this Action, as well as Plaintiff's reasonable attorneys' fees plus interest to the fullest extent permitted by law; and

E.      Such other and further relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiff Stevel Smith hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991.

Dated: January 11, 2022

Respectfully submitted,

*/s/ Brett D. Kaplan*_____
Brett D. Kaplan, Esq.
Florida Bar No. 1031866
brett@dereksmithlaw.com
**DEREK SMITH LAW GROUP, PLLC**
701 Brickell Ave., Suite 1310
Miami, Florida 33131
Telephone: (305) 946-1884
Facsimile: (305) 503-6741
*Attorneys for Plaintiff Stevel Smith*